[No. 1159.]

## CHARLES SACALARIS, RESPONDENT, *v.* EUREKA AND PALISADE RAILROAD COMPANY, APPELLANT.

AGENTS—RAILWAY CORPORATIONS—JUDICIAL NOTICE OF AUTHORITY—RECEIPT OF CORDWOOD.—Courts will take judicial notice of the authority of the managing agents of a railroad corporation, and, in the absence of any evidence upon the subject, will presume that its superintendent is empowered to conduct its ordinary business transactions, such as the reception of cordwood.

IDEM.—An agent having the oversight and charge, with the power to direct, has a general and discretionary power within the scope of his agency.

IDEM—DECLARATIONS OF AGENT—WHEN ADMISSIBLE.—Declarations of an agent made in the course of the transaction out of which the action arose are admissible in evidence against his principal.

CONFLICT OF EVIDENCE.—Where the evidence, in regard to a fact in issue, is conflicting, it is the duty of the jury to decide such fact, and the court will not interfere with their determination of it.

APPEAL from the District Court of the Sixth Judicial District, Eureka County.

The facts are sufficiently stated in the opinion.

*Wren & Cheney*, for Appellant:

I. The evidence is sufficient to justify a verdict for plaint-

iff. Paquin was the agent of Sacalaris, with authority to sell the wood in controversy. Sacalaris, by permitting Paquin to take possession of the wood and haul it to Eureka, with power to sell an unmarked, and, to third persons, undistinguishable half, and by knowingly permitting and authorizing him to sell and dispose of a half, with knowledge that the whole was being placed upon the ground of a party to whom Paquin was delivering and selling his portion, and at a place where the whole was being sent for the purposes of sale, and at a time and place where the defendant was buying and receiving wood from Paquin, so clothed Paquin with the *indicia* of ownership and apparent authority to sell and dispose of the whole of the wood, that defendant had the right to believe that Paquin was the owner of the whole of the wood, or had full power as agent to sell it. Plaintiff by his conduct clothed Paquin with implied authority to sell the wood in controversy to the defendant, notwithstanding any secret instructions or understanding that may have been given or had between plaintiff and Paquin, the rule being that where one has clothed another with the *indicia* of ownership and permitted him to assume the control of property with the apparent power of sale, the apparent authority is the real authority, and the person so holding out another as having authority is bound by the acts of the agent within the scope of the authority which the principal by his acts or silence has warranted third persons in believing the agent possesses. (*Wright* v. *Solomon*, 19 Cal. 64; *Saltus* v. *Everett*, 20 Wend. 267; *Thompson* v. *Blanchard*, 4 Comst. N. Y. 303; *Gass* v. *Hampton*, 16 Nev. 185; *Rice* v. *Groffman*, 56 Mo. 434; *Stone* v. *Marye*, 14 Nev. 362; *Lumley* v. *Corbett*, 18 Cal. 494; *Hostler* v. *Hayes*, 3 Cal. 302; *Dunning* v. *Roberts*, 35 Barb. 467; *Bridenbecker* v. *Lowell*, 32 Barb. 9; *Johnson* v. *Jones*, 4 Barb. 369, 373; *Calias Steamboat Co.* v. *Van Pelt*, 2 Black. U. S. 372; *Pickering* v. *Busk*, 15 East R. 38, 43; *Gregg* v. *Wells*, 10 Ad. & E. 90; *Dyer* v. *Pearson*, 3 Barn. & Cres. 38, 42; Storey on Agency, 93, 127, 136.) Plaintiff is estopped from denying that Paquin had authority to sell

the wood in controversy to defendant. (Whart. on Ev. secs. 1142, 1144; Storey Eq. Jur. sec. 385; *Stone* v. *Marye*, 14 Nev. 362; *Gass* v. *Hampton*, 16 Nev. 185; *Niven* v. *Belknap*, 2 John. 589.)

II. Everts was a special agent of the company, and it is not shown that he had authority to act for the company in this matter. (*Adriance* v. *Roome*, 52 Barb. 399; *Walworth Co. Bk.* v. *Farmer's L. & T. Co.*, 14 Wis. 325; *Risley* v. *I. B. & W. R. Co.*, 1 Hun 202; *C. & N. W. R. Co.* v. *James*, 22 Wis. 194; *Corn Ex. Bk.* v. *Cumberland Coal Co.*, 1 Bosw. 436; *Rankin* v. *N. E. and N. S. M. Co.*, 4 Nev. 78.) A corporation can only act through its officers and agents. The power and authority of the officer is only that with which they are invested by virtue of the act of incorporation, or given them by the vote of the stockholders, the by-laws of the company or by custom or usage, and the extent of that authority is found in the acts of incorporation, the records of the company and the extent of the custom or usage. But it matters not from which source the authority is derived, its existence must be established by proof and not by presumption. To these sources third persons must, in doubtful cases, look to determine the extent of the powers of the officers, or otherwise submit to the consequences resulting from their omission to do so. In this respect there is a material difference between the case of an individual and his agent and that of a corporation and its officers. (*Salem Bank* v. *Gloucester Bank*, 17 Mass. 28; Green's Brices Ultra Vires, 395, 396, 470, 472.) The alleged admissions and declarations were not part of the *res gestæ.* (*Meyer* v. *V. & T. R. R. Co.*, 16 Nev. 344; *Rollins* v. *Strout*, 6 Nev. 150; Whart. on Ev. sec. 1178.)

*G. W. Baker*, for Respondent:

I. In order to constitute an estoppel *in pais*, there must have been a representation or concealment of material facts. The representation must have been made with knowledge of the facts. The party to whom made must have been ignorant of the truth of the matter. "It must have been made

with the intention that the other party should act upon it."
" The other party must have been induced to act upon it."
(Bigelow on Est. 480.)   In the case at bar, there was no
representation made at all, and no concealment of any fact,
either material or otherwise.   The defendant was not
induced to buy the wood from Paquin by reason of any act,
admission or representation of the plaintiff, and did not
attempt to establish such a state of facts upon the trial.
The doctrine of equitable estoppels by conduct does not
apply to the facts of this case.   (*Malloney* v. *Horan,* 49 N.
Y. 111; Bigelow on Est. 561.)   The question is:   Does
the mere fact that a party employs another to haul wood for
him to market, authorize the freighter to sell and dispose of
the wood and convey a good title to the purchaser, or, in
other words, will an innocent purchaser of personal property
such as the property in controversy in this action, be pro-
tected in his purchase, upon the fact alone of the possession
of the party selling?   This proposition must be answered
in the negative.   (*Kinder* v. *Shaw,* 2 Mass. 399; *Wright* v.
*Solomon,* 19 Cal. 76; *Pickering* v. *Buck,* 15 East. 38; *Gass*
v. *Hampton,* 16 Nev. 190; *Covell* v. *Hill,* 4 Den. 323.)
The authorities cited by appellant upon this proposition
relate almost exclusively to negotiable instruments, which
pass from hand to hand by delivery, and purchasers for
value are protected under the law merchant.

II. It was a mooted question in this case whether the de-
fendant had actually purchased and received the wood in
controversy from Paquin at the time the declarations of
Everts were made and this question must have been deter-
mined by the jury adverse to the defendant.   Hence we
say that at the date of those declarations the sale was not
made, that they were a part of the *res gestæ* and not open
to the objection urged by counsel, nor within the restriction
of their authorities.   If the defendant did not buy the wood
from Paquin, it stands in the position of a bare, naked tres-
passer, indefensible against the rights of plaintiff to recover
in the action.

III. It was a fact material in the case, to show whether

or not there had been an acceptance of the wood. The theory of the defendant is that it is an innocent purchaser. If it received notice of plaintiff's claim before acceptance of the wood, it destroys the *bona fides* of the transaction, so far as the defendant is concerned. Everts testified that he had accepted the wood before notice of plaintiff's claim. It was competent for the purposes of impeachment to show that he had stated that he had not accepted the wood. (*Benjamin* v. *Wheeler*, 8 Gray 409 ; 1 Whart. on Ev. sec. 551 and cases cited.) There is a very clear distinction between the expression of an opinion and the statement of a fact in issue.

IV. If there were any particular points upon which the defendant desired to have the jury instructed, such as agency, estoppel and the like, it should have requested such instructions, otherwise the court is not bound to so charge. (*Rozar* v. *Burns*, 13 Ga. 34 ; *Hatch* v. *Spearin*, 11 Me. 354 ; *Davis* v. *Elliott*, 15 Gray 90 ; *Hall* v. *Weir*, 1 Allen 261 ; *Zabriskie* v. *Smith*, 13 N. Y. 322 ; *Parsons* v. *Brown*, 15 Barb. 590.) It is no ground of error that the court did not discuss every possible aspect of the cause in the absence of any prayer or request for instructions upon questions which might properly be the subject of instructions. (*Wertz* v. *May*, 21 Penn. St. 274 ; *Fisher* v. *Filbert*, 6 Id. 61.) The plaintiff's theory of this case was, that he was owner of the wood in controversy ; that he had never parted with his right of property in it.

V. The verdict was right under the evidence, there was no error of law which could in any way have prejudiced the defendant, and error without prejudice will be disregarded. (*Green* v. *Ophir S. M. Co.*, 45 Cal. 522 ; *Hisler* v. *Carr*, 34 Cal. 641 ; *Mitchell* v. *Bromberger*, 2 Nev. 345 ; *Robinson* v. *Imperial M. Co.*, 5 Nev. 46 ; *Blackie* v. *Cooney*, 8 Nev. 41.)

*Wren & Cheney*, for Appellant in reply :

I. A design to mislead is not essential to an equitable estoppel. (2 Pom. Eq. Jur. secs. 805, 811, 818 ; *Mitchell* v.

*Reed,* 9 Cal. 204; *McGee* v. *Stone,* 9 Cal. 606; *Bank* v. *Bank,* 50 N. Y. 575; *Bank* v. *Hazard,* 30 N. Y. 226; *Blair* v. *Wait,* 69 N. Y. 113, 116.)

II. It is not necessary that the action taken by the party claiming the estoppel should have been affirmative. A failure to act is sufficient. (2 Pom. Eq. Jur. sec. 812; *Bank* v. *Bank,* 50 N. Y. 575, 584; *Knight* v. *Wiffen,* 5 L. R. Q. B. 660; *Casco Bank* v. *Keene,* 53 Me. 103.)

III. When the evidence of a party, upon whose uncorroborated testimony the verdict of the jury rests, is contradictory and self-impeaching, the verdict ought to be set aside. (1 Phil. on Ev. 597.)

IV. In considering objections to the introduction of evidence, the purpose for which it was offered should be kept in view. (*Henry* v. *Everts,* 29 Cal. 60; *Sickman* v. *Lapsley,* 13 S. & R. 224; *Eyrick* v. *Hetrick,* 13 Pa. St. 491.)

V. The evidence was inadmissible as impeaching testimony. At the time it was offered the party who alone could be impeached by it had not testified, and no foundation had been laid for its admission as impeaching testimony. (2 Phil. Ev. 802, 803.)

By the Court, BELKNAP, J.:

Plaintiff was the owner of a quantity of cordwood in the vicinity of the town of Eureka. He contracted with one Paquin to haul the wood to the town, and agreed to pay him one-half of the wood he should haul for his services. Accordingly, Paquin hauled four hundred and sixty-four cords of wood. Fifty cords of this wood were deposited in the immediate neighborhood of the depot of defendant, eighty-five cords at a point in the town called "the Chinese wash-house," and the remainder (with which we are not concerned) at other places. These two lots of wood were the property of the plaintiff; but defendant contends that it purchased these from Paquin under circumstances creating an equitable estoppel against further claim of ownership upon the part of plaintiff. This contention is resisted as to

the eighty-five cords, upon the ground that defendant had notice of plaintiff's claim of ownership of this lot before it accepted it.

The only evidence tending to show that defendant had not accepted the wood, were the declarations of Everts—its superintendent—alleged to have been made after the time when this lot of wood had been deposited at "the Chinese wash-house," upon a demand therefor by plaintiff, before the commencement of this action.    There was no evidence of authority in the superintendent to make the declaration except such as the title to his office implies.    Railway corporations enter so largely into the business transactions of the country that courts should take judicial notice of the authority of their managing officers, upon the same principle that judicial notice is taken of the duties of officers of banks and other agents, whose authority is so generally understood as not to be the subject of inquiry.    It is a matter of common knowledge that the superintendent of a railroad corporation is empowered to conduct its ordinary business transactions.    The use of cordwood is convenient, and, we may fairly say, indispensable, to the operation of railroads within this state.    To receive such wood, and declare whether it has been received, is, consequently, incident to the business of a railroad corporation, and the authority to determine matters of this nature must rest with some of its agents or officers.    We assume that the officer charged with the conduct of defendant's ordinary business has the authority to determine so common-place a matter as the receipt of cordwood.    It is customary with railroad corporations to confer upon their officers and agents titles indicating and suggesting in general terms their authority to persons having business with the corporation.    When an agent is clothed with a title implying general powers, as superintendent, the business public and courts may fairly presume he is what the corporation holds him out as being. Webster says, a superintendent is "one who has the oversight and charge of something, with the power of direction." An agent having the oversight and charge, with

the power to direct, has a general and discretionary power within the scope of his agency.

The law touching the liability of corporations arising from the acts of their agents has been greatly modified, as will be seen be seen by reference to recent decisions.

In *Adams M. Co.* v. *Senter*, 26 Mich. 73, the court said : " The next question refers to the extent of Frue's authority, independent of specific and expressly granted powers. We are not satisfied that any testimony would be needed to show the extent of the ordinary powers of an agent in charge of such a mine. The authority of such officers must, within the usual range of business, at least be recognized judicially, like that of bank cashiers, vessel captains, and other known agents. The mining law recognizes agents by name, as known representatives upon whom process may be served. They are the persons who have the charge, personally of the local business at the mines, and are necessarily to be treated, in law, as general agents, to do all that is fairly within the scope of corporate business in conducting the operations in that locality. The testimony of Mr. Palmer, which shows the usual range of such agencies, indicates no more than should be inferred. The business could not be conducted at all without a very wide discretionary power. There is no reason, and can be no legal principle, which will put the agent of a corporation on any different footing than the agent of an individual in regard to the same business. A general agent needs no instructions within the range of his duties, and any limitation on his usual powers would not bind others dealing with him and not warned of the restrictions."

In *Grafius* v. *Land Co.*, 3 Phila. 447, the president of an incorporated company was intrusted with the management of an enterprise. His authority was limited by the directors, and did not authorize him to render the corporation liable for the services of the plaintiff. These facts were established in defense, but the court said : " When a body, incorporated avowedly for a special object, intrusts its president, or other principal officer, with the manage-

ment of the business for which its powers have been conferred upon it by the courts or the legislature, it necessarily gives him the air and aspect, and clothes him with the functions, of a general agent, and should not afterwards be allowed to say that his powers are, in fact, special, and not general, to the injury of those who have trusted him on the faith and credit of the assets and resources of the corporation.    In general, those who deal with an agent are bound to ascertain the scope and extent of his authority, and cannot go beyond it for the purpose of charging the principal, even when they have been misled by their own credulity and the misrepresentations of the agent.    But when a principal puts the agent forward as a general agent, or places him in a position where others are justified in the belief that his powers are general, the restrictions which may be imposed privately on the agent, will be immaterial, except as between him and the principal, and can have no effect on the rights or remedies of third persons.''

A similar question arose in *Lee* v. *Pittsburg C. M. Co.*, 56 How. Pr. 376, and was discussed by the court :    ''What general or special powers were by the bond expressly conferred upon Mr. Mullin as such president and manager, or what power inhered in those officers, we can only determine (in the absence of positive evidence) by inferences.from such facts proved as throw light on this point, aided by the presumption that, as the chief executive officer and manager of the company, he must have been clothed with some powers and duties which, of necessity, pertained to those positions, as it was shown that the business for which the defendant was organized was the mining, shipping, and selling of coal; that it had mines in Pennsylvania, and large quantities of coal for sale, which it sought to market in Buffalo and the neighboring province of Canada.    We may fairly presume, further, that the defendant's president and manager had, by virtue of his offices, authority to make those contracts in defendant's behalf which it was necessary some agent should make for the prosecution of its business, and which the daily exigencies of that business might

require.    The hiring of operatives to carry on the work of mining coal, the making of contracts for the shipment of coal to the various markets, the employment of agents to receive and take care of coal at those markets, to attend to its sale, and to collect and remit the proceeds, were necessary to the operations of the corporation; and it was also necessary that some agent should be clothed with authority to make such agreements.    The public would have the right to assume that the president and manager of the company claiming such authority and exercising it, did lawfully possess it, and treat with him accordingly.

" Upon similar presumptions all business men deal with the executive officers of banking, insurance, railroad, manufacturing, and other corporations, whose operations move the vast and complicated machinery of trade and commerce. Their boards of directors may, and, no doubt, often do, adopt rules and regulations defining the powers and duties of the various officers through whose agency the corporate powers and franchises are exercised.    But such rules and regulations are to be found only upon the minutes of the directors' proceedings, or other private records of the corporation.    They are not published, nor do the public, with whom the officers of a corporation transact business, know, or have the means of knowing, what such rules and regulations are.    And it often happens—so often as to be the rule rather than the exception—that the chief officers of a corporation exercise a very wide range of powers, virtually grasping the entire direction and control of all its operations, with the tacit consent and approval of the corporation, though it has never by any direct vote or recorded act defined the nature or extent of their authority.    It is, therefore, very difficult, if not impossible, for those having dealings with corporate bodies to determine, except by circumstances and inference, what authority such officers have, or, in case of litigation, to prove their authority by positive evidence.    Ought not the same evidence upon which prudent business men ordinarily infer the existence of the authority, to be satisfactory to courts and juries?    And

would not the enforcement of more stringent rules embarrass and hinder the operations of trade and commerce, and prove vexatious and injurious to the interests of the corporations themselves?''

These considerations led the court to the conclusion that defendant's president and manager was the officer who, in the ordinary course of business, would be expected to possess authority to employ the plaintiffs, and plaintiffs had the right to presume that the officer was so authorized. (*F. & M. Bank* v. *B. & D. Bank*, 28 N. Y. 425; *T. W. & W. R. Co.* v. *Rodrigues*, 47 Ill. 188; *McKiernan* v. *Lenzen*, 56 Cal. 61; *Southgate* v. *A. & P. R. Co.*, 61 Mo. 89; *In re German M. Co.*, 19 Law & Eq. 591; *Walker* v. *G. W. R. Co.*, 2 L. R. Exch. 228; *Wild* v. *N. Y. & A. S. M. Co.*, 59 N. Y. 644.)

Further objection is made to the introduction in evidence of the admission of the superintendent, upon the ground that it was the statement of a past transaction and formed no part of the *res gestæ*. Plaintiff's theory is that the lot of wood of eighty-five cords was set apart for the defendant, but that defendant had not accepted it, and therefore the transaction was incomplete and continuing. In this view, the declarations were made in the course of the transaction and were admissible.

Objection is also made that the evidence is insufficient to support the verdict. This objection is based upon the fact that plaintiff allowed Paquin to deal with the wood in such a manner as to lead defendant's agents to believe he owned it. This fact constitutes the estoppel pleaded by defendant. One hundred and sixty cords of wood were in controversy. Plaintiff recovered judgment for the return of ninety-five cords of wood, or the value thereof. There was evidence tending to show that plaintiff was estopped from asserting ownership to the fifty-cord lot; that the corporation had notice of plaintiff's claim of ownership before it accepted the eighty-five-cord lot. The evidence upon these matters was conflicting. It was the province of the jury to determine these facts. With that determination we cannot

interfere. If defendant had notice of plaintiff's claim of ownership before its acceptance of the eighty-five cords of wood, plaintiff was entitled to recover them or their value. There was no controversy as to the fact that ten cords of other wood belonging to the plaintiff had been taken by defendant. There being testimony to sustain each of these matters, it is evident that the evidence is not insufficient to sustain the verdict.

The judgment and order of the district court are affirmed.